ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **ENEIDA ALICEA PÉREZ**<br>DEMANDANTE(S)-APELANTE(S)<br><br>V.<br><br>**HOSPITAL BUEN SAMARITANO**<br>DEMANDADA(S)-APELADA(S) | KLAN202200761 | *APELACIÓN*<br>procedente del Tribunal de Primera Instancia, Sala Superior de *SAN SEBASTIÁN*<br><br>Caso Núm.<br>**A2CI201800170 (0002)**<br><br>Sobre:<br>Despido Constructivo; Discrimen; Represalias |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Jueza Rivera Pérez

*Barresi Ramos*, juez ponente.

**S E N T E N C I A**

En San Juan, Puerto Rico, hoy día 28 de junio de 2024.

Comparece ante este Tribunal de Apelaciones, la señora **ENEIDA ALICEA PÉREZ** (señora **ALICEA PÉREZ**) mediante *Apelación* incoada el día 29 de septiembre de 2022. En su recurso, nos solicita que revisemos la *Sentencia* decretada el 22 de agosto de 2022 por el Tribunal de Primera Instancia (TPI), Sala Superior de San Sebastián.[1] Mediante dicha determinación judicial, se desestimó, con perjuicio, la *Demanda*.

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

**- I –**

La señora **ALICEA PÉREZ** trabajó para el **HOSPITAL BUEN SAMARITANO** **(HBS)** desde el 1 de julio de 1999 hasta el 20 de octubre de 2017.[2] Durante

---

[1] Este dictamen judicial fue notificado y archivado en autos el 30 de agosto de 2022. Véase Apéndice de la *Apelación,* págs. 101- 120.
[2] *Íd.*, pág. 106.

Número Identificador:
SEN2024_____

todos esos años ostentó varias posiciones y se desempeñó con excelencia.[3]

Desde el 17 de marzo de 2012 hasta el 30 de noviembre 2016, la señora **ALICEA PÉREZ** ocupó el cargo de directora interina del Departamento de Servicios Administrativos de Enfermería.[4] Durante su desempeño en la mencionada posición, la Lcda. Marilyn Morales (Lcda. Morales), su supervisora y la directora del **HBS**, le informó que la estaría evaluando para el nombramiento en propiedad de la dirección del Departamento de Servicios Administrativos. En el proceso de evaluación, la señora **ALICEA PÉREZ** resultó favorecida entre la administración para ocupar el cargo en propiedad.[5]

Empero, en noviembre de 2016, mientras aun la señora **ALICEA PÉREZ** era evaluada para el cargo de directora en propiedad, el personal de enfermería que estaba bajo su supervisión cumplimentó solicitud de representación de Unión en el **HBS**, y la señora **ALICEA PÉREZ** no tenía conocimiento ni tuvo información de sus empleados directos.[6]

Consecuentemente, el 16 de noviembre de 2016, la Lcda. Morales y el señor José García, director de Recursos Humanos, le informaron a la señora **ALICEA PÉREZ** que no se le concedería la posición de directora de Enfermería y le ofrecieron el puesto de gerente administrativa de Premium Healthcare al cual fue nombrada el 1 de diciembre de 2016.[7] La señora **ALICEA PÉREZ** estaba inconforme con el cambio de posición, sin embargo, continuó ejerciendo sus funciones hasta el 20 de octubre de 2017 cuando decidió presentar una carta de renuncia.[8]

Ante ello, el 7 de noviembre de 2017, la señora **ALICEA PÉREZ** interpuso una *Demanda* sobre despido constructivo, injustificado y discriminatorio contra **HBS**.[9] La *Demanda* incluyó tres (3) reclamaciones contra **HBS**, a saber:

---

[3] Véase Apéndice de la *Apelación*, págs. 350– 400.
[4] *Íd.*, pág. 103.
[5] *Íd.*, págs. 103– 104.
[6] *Íd.*, pág. 107.
[7] *Íd.*, pág. 109.
[8] *Íd.*, pág. 231.
[9] *Íd.*, págs. 1- 9.

(1) alegado despido constructivo a tenor con la Ley Núm. 80 de 1976, según enmendada, conocida como *Ley de Indemnización por Despido Sin Justa Causa*, 29 LPRA § 185a; y (2) dos reclamaciones de discrimen en virtud de la Ley Núm. 100 de 1959, según enmendada, conocida como *Ley Contra el Discrimen en el Empleo*, 29 LPRA § 146a, por razón de raza y discrimen por condición social.[10]

Oportunamente, el 29 de diciembre de 2017, **HBS** presentó su *Contestación a la Demanda*.[11] Negó la mayoría de las alegaciones y levantó sus defensas afirmativas, entre estas, que, en octubre de 2017, la señora **ALICEA PÉREZ** renunció libre y voluntariamente.

Luego de un descubrimiento de prueba, el 24 de julio de 2019, **HBS** presentó una *Moción Sentencia Sumaria*.[12] El 18 de septiembre de 2019, la señora **ALICEA PÉREZ** presentó su *Oposición a Moción de Sentencia Sumaria*.[13] Así las cosas, el 17 de enero de 2020, el foro primario dictaminó *Resolución* en la cual, en lo pertinente, dispuso:

> Está en controversia si los eventos configuraron un ambiente de trabajo intimidante, hostil y ofensivo, a tal grado que la querellante no tenía otra opción que renunciar. Se declara No Ha Lugar la Moción de Sentencia Sumaria presentada en cuanto a la causa de acción bajo la Ley 80, sin embargo, **se desestima con perjuicio** la causa de acción por discrimen por condición social y raza, pues la querellante no ha establecido ni un solo elemento de esta causa de acción.[14]

Un tiempo después, el 9 de agosto de 2021, las partes presentaron el *Informe Preliminar Entre Abogados Enmendado* (*Informe*).[15] Dicho *Informe*, contiene los hechos incontrovertidos y la documentación estipulada. El juicio fue celebrado los días 30 y 31 de agosto de 2021 así como el 9 de noviembre de

---

[10] Véase Apéndice de la *Apelación*, pág. 101.
[11] *Íd.*, págs. 10- 21.
[12] Cabe destacar que, de toda la prueba documental, solo dos (2) documentos fueron estipulados exclusivamente en cuanto a autenticidad, no en cuanto a su contenido. Los documentos no estipulados fueron a saber: (1) la carta de 12 de diciembre de 2016; y (2) la carta de 20 de octubre de 2017, renuncia de la señora **ALICEA PÉREZ**. Véase Apéndice de la *Apelación*, págs. 27- 52.
[13] *Íd.*, págs. 53- 71.
[14] Esta *Resolución* no fue apelada y sus pronunciamientos constituyen la ley del caso. Véase, Apéndice de la *Apelación*, págs. 72- 77.
[15] *Íd.*, págs. 78- 100.

2021 (de manera virtual). Tras concluir el juicio, el 22 de agosto de 2022, el tribunal *a quo* pronunció la *Sentencia* apelada en la cual esbozó setenta y cuatro (74) determinaciones de hecho basándose en la prueba testifical y documental desfilada, así como admitida, observada y escuchada.

Las determinaciones de hecho del foro primario son las siguientes:

1. La Sra. Eneida Alicea Pérez trabajó para el Hospital Buen Samaritano del 1 de julio de 1999 al 20 de octubre de 2017.
2. Desde el 17 de marzo de 2012 hasta el 30 de noviembre de 2016, la Sra. Alicea Pérez se desempeñó como Directora Interina en el Departamento de Servicios Administrativos de Enfermería.
3. La Sra. Alicea Pérez estaba consciente que esa posición de Directora Interina no era una plaza permanente.
4. En noviembre de 2016, la supervisora directa de la Sra. Alicea Pérez fue la Lcda. Marilyn Morales.
5. La Lcda. Marilyn Morales, comenzó a dirigir el Hospital Buen Samaritano en abril de 2016, tras más de veinte (20) años de experiencia en el Hospital Presbiteriano, donde una unión representa a múltiples empleados.
6. Para noviembre de 2016, la Lcda. Marilyn Morales, Directora Ejecutiva del Hospital Buen Samaritano, inició gestiones para nombrar a la Sra. Alicea Pérez como directora del Departamento de Enfermería en propiedad, no como interina.
7. A tales fines, a la Sra. Alicea Pérez le fue informado que se estaría evaluando para el puesto en propiedad.
8. La Lcda. Marilyn Morales, quien llegó en abril de 2016 a la institución, no había tenido la oportunidad de evaluar a la Sra. Alicea Pérez.
9. Cuando la Lcda. Marilyn Morales terminó su proceso de evaluación, le informó a la Sra. Alicea Pérez que realizaría una reunión con los directores, administradores y con la Junta de Síndicos del Hospital para solicitar que se le diera la oportunidad de ocupar la posición en propiedad.
10. Tras la reunión convocada por la Lcda. Marilyn Morales, tanto la Directora Ejecutiva, los miembros de la Junta de Directores, como los médicos y administración de la institución aprobaron y estuvieron de acuerdo en que la Sra. Alicea Pérez fuera nombrada directora de Enfermería en propiedad.
11. Luego de aprobar el nombramiento, procedía formalizarlo mediante un contrato escrito, pero eso no se completó.
12. La intención de la Lcda. Morales era nombrar a la demandante como directora e irla desarrollando y ayudándole a crecer profesionalmente.
13. A pesar de lo anterior, recibió una petición de representación en su oficina, donde se le informó de un movimiento interno en el hospital para unionarse.
14. La Lcda. Morales se sintió triste con la notificación de representación de la unión, pues llegó al Hospital con entusiasmo y con una determinación de puertas abiertas. Entendió que esto de la unión era devastador para el Hospital.

15. El 16 de noviembre de 2016, antes de que se oficializara el nombramiento, el Sr. José García (Director de Recursos Humanos de HBS) y la Lcda. Marilyn Morales le informaron a la Sra. Alicea Pérez que se había radicado la petición de representación de una unión en el personal de enfermería.

16. La Lcda. Morales habló con la Sra. Alicea Pérez, quien le contestó *"que ella no tenía conocimiento de que había un movimiento interno en el Hospital de disgusto con la administración para unionarse"*.

17. Para la Lcda. Morales, era preocupante la situación, pues esa falta de conocimiento le había impedido tomar medidas para conocer el sentir, sus quejas y tratar de mejorar las relaciones con el grupo más grande de empleados que ve a los pacientes y ofrece cuidado directo.

18. Como resultado de lo anterior, después de consultarlo con los empleados, con los miembros del gabinete, miembro de la Junta de Directores, entre otro personal, la Lcda. Morales tomó la decisión de no darle el puesto de directora de Enfermería en propiedad, según ella había [estado] promoviendo.

19. El grupo más grande que tiene el Hospital es el grupo de enfermería, es el que brinda cuidado directo, así que para la Lcda. Morales era sumamente importante y vital ese departamento.

20. Al momento de la unión intentar entrar al Hospital, ya había obtenido al menos cuarenta y dos (42) firmas de enfermeras para poder iniciar su petición de representación.

21. El personal de enfermería entendía que no había espacio para una comunicación directa con la Sra. Alicea Pérez y establecieron ese otro mecanismo para tratar de resolver sus inquietudes y necesidades. No estaban contentos con su administración de enfermería.

22. Según la Sra. Alicea Pérez reconoció, la razón y la explicación que le dieron para el cambio de posición fue la petición de la unión. "*...que ellos no concebían que por una unión... que la unión tratara de entrar al Hospital y que yo como Directora de Enfermería no me hubiera enterado... y eso fue la única explicación*".

23. Asimismo, la Sra. Alicea Pérez nos reconoció que la razón brindada por el Hospital para ese cambio de posición, la entrada de la unión era algo que afectaba el buen y normal funcionamiento del Hospital. Para que el Hospital funcione, es importante poder mantener el diálogo directo con su personal de enfermería.

24. Tener conocimiento o no de las posibilidades de que, entre una unión al Hospital, es importante para el Hospital.

25. En el caso de la Directora de Enfermería, que era el puesto ocupado por la demandante de forma interina, la Sra. Alicea Pérez reconoce que lo razonable era que fuera ella la primera en conocer dicha situación y eso no ocurrió.

26. La decisión del cambio de posición fue de la Lcda. Marilyn Morales, la misma persona que impulsaba el concederle a la Sra. Alicea Pérez la posición de manera permanente.

27. Efectivo el 1 de diciembre de 2016, la Sra. Alicea fue nombrada Gerente Administrativa de Premium Healthcare Clinic.

28. Ante el cambio de puesto, el 12 de diciembre de 2016, la Sra. Alicea Pérez le envió una comunicación a la Lcda. Marilyn Morales solicitando la razón del por qué le habían quitado la posición.

29. El 19 de diciembre de 2016, la Lcda. Marilyn Morales contestó a la Sra. Alicea Pérez la comunicación. En su contestación expresó lo siguiente:

    *"Como usted bien reconoce en su escrito hacia ello fueron dirigidos nuestro[s] esfuerzo[s] y expresiones. Con el correr del tiempo llegué a la conclusión que en este momento necesitamos una directora o director de servicios de enfermería que resultara más afín a las expectativas de nuestra facultad médica, al sentir de los empleados adscritos al departamento de enfermería y al estilo de administración de la suscribiente".*

30. Para la Lcda. Morales, era vital tener en esa posición a una persona con buena comunicación con el personal de enfermería, luego de escuchar el sentir del personal que manifestó no estar a gusto con la dirección y los estilos de la Sra. Alicea Pérez.

31. Posterior al recibo de la carta de la Lcda. Marilyn Morales, la Sra. Alicea Pérez no presentó ninguna comunicación escrita adicional relacionada con su nuevo puesto, hasta su renuncia.

32. La Sra. Alicea Pérez se desempeñó como Gerente Administrativa/Clínica del "Premium Healthcare Clinic" del Hospital Buen Samaritano desde el 1 de diciembre de 2016 hasta su renuncia el 20 de octubre de 2017.

33. Al momento de asignarle el puesto, a la Sra. Alicea Pérez se le informó que era una posición en un nuevo proyecto del Hospital.

34. En diciembre de 2016, mientras la Sra. Alicea Pérez ya estaba en la posición de Gerente Administrativa, recibió una comunicación por Messenger del representante de la unión, diciéndole que necesitaba reunirse urgentemente con ella por la injusticia que cometió el Hospital con su posición.

35. A pesar de que la Sra. Alicea Pérez sabía que para el Hospital era importante la situación que estaba ocurriendo con la unión, en ningún momento le comunicó al Hospital que había recibido esos mensajes ni que había recibido acercamiento de los líderes de la unión.

36. Cuando la Sra. Alicea Pérez se nombró en esa posición, comenzó a ser supervisada por la nueva Directora Interina de Enfermería, la Sra. Myrna Guevara.

37. La Sra. Myrna Guevara no tuvo ninguna participación en el cambio de la Sra. Alicea Pérez.

38. La Sra. Alicea Pérez conocía desde antes del nombramiento a la Sra. Myrna Guevara pues trabajan juntas en el Hospital desde el 1999 y terminaron juntas la maestría en enfermería.

39. Entre los años 2012 hasta 2016, la Sra. Alicea Pérez y la Sra. Myrna Guevara en ocasiones viajaban juntas a la Universidad, hacían trabajos de la maestría juntas y se graduaron juntas.

40. Mientras la Sra. Alicea fue supervisada por la Sra. Myrna Guevara, ésta le solicitó ponchar su asistencia y la demandante se rehusó.

41. Luego de discutirlo con el Sr. José García, éste le notificó a la Sra. Alicea Pérez que debía registrar su asistencia pues todos los gerentes del hospital y todo ese grupo lo hacían, al grado que, incluso, la Sra. Myrna Guevara siendo nombrada Directora Interina, también registraba su asistencia ponchando en el reloj.

42. El requisito de registrar su asistencia no era un requisito impuesto solamente a la Sra. Alicea Pérez. Este requisito aplicaba a todos los demás supervisores y gerentes del Hospital.

43. Entre el 1 de diciembre de 2016 y octubre de 2017, excepto por el asunto del registro de asistencia, la Sra. Alicea Pérez nunca se quejó de su supervisora.

44. Entre el 1 de diciembre de 2016 y septiembre del 2017, previo al paso del huracán María, la Premium Healthcare Clinic del Hospital Buen Samaritano nunca abrió sus puertas porque no tenía la licencia del Departamento de Salud que le permitiera operar.

45. Tras el paso del huracán María, a la Sra. Alicea Pérez inicialmente se le indicó que posiblemente tenían que bajarle las horas. Después le pidieron cubrir la Sala de Emergencia. Entonces luego, le llamaron para decirle: *"Mira, vamos a abrir la clínica, vamos a hacer todas las funciones que ya tú tenías asignadas, vas a estar a cargo de la clínica, este... la señora Arleen Jiménez va a estar contigo allá, en la parte del registro, con sus dos, eh... personas de registro y tú vas a estar a cargo de toda la clínica, lo que es administrativo y clínico, excepto lo de registro"*.[16]

46. Todavía en ese momento la Clínica no tenía licencia para operar.

47. El huracán María removió todo el empañetado de la pared del Hospital, arrancó los conductos del techo, tapó los desagües, lo que contribuyó a inundar el primer piso de la institución y dañar sus tres elevadores. Además, cesó la distribución de agua dado un problema con la represa Guajataca, lo que ocasionó que el aire acondicionado no pudiera operar.

48. Los pacientes en intensivo y los que necesitaban atención de hospitalización se enviaron al Centro Médico de Mayagüez y al personal que estaba destacado en esos departamentos fue enviado a sus casas.

49. El único servicio que se quedó fue el de Sala de Emergencias, porque los pacientes llegaban y había que atenderlos.

50. Pero la Sala de Emergencias estaba en condiciones infrahumanas, la temperatura estaba en 90 grados, el piso estaba inundado. Como resultado, cuando el Hospital se cerró, la Lcda. Morales decidió abrir en un edificio anexo una Sala de Emergencia temporera y la clínica donde se estaba asignando a la Sra. Alicea Pérez.

51. La clínica comenzó a operar a finales de septiembre de 2017.

---

[16] Véase *Transcripción de la Prueba Oral*, págs. 113: 17– 21; 137: 12– 24; 138: 1– 12; 139: 2– 12.

52. Entre finales de septiembre y el 20 de octubre de 2017, la Sra. Alicea Pérez trabajó cinco (5) días a la semana.

53. En ese tiempo, la Sra. Arleen Jiménez también trabajaba cinco (5) días a la semana.

54. La Sra. Arleen Jiménez trabajaba supervisando dos (2) empleados de registro en la clínica. Además, ella atendía las áreas de registro y de facturación en el área de la Sala de Emergencias temporera.

55. Las funciones de registro y de facturación de la Sra. Arleen Jiménez no las atendía la Sra. Alicea Pérez.

56. Luego de estar asignada a tiempo completo, a la Sra. Alicea Pérez se le redujo su horario.

57. La decisión de reducir ese horario no fue de la Sra. Myrna Guevara, sino de la Lcda. Marilyn Morales.

58. Esta reducción de horas se debió a la situación precaria en que había quedado la institución tras el paso del huracán María.

59. A diferencia de la Sra. Alicea Pérez, hubo personas a quienes le pidieron que se quedaran en su casa porque no había trabajo que realizar.

60. La Sra. Myrna Guevara fue quien le notificó a la Sra. Alicea Pérez y demás personal de la reducción de horario.

61. Al notificarle de su reducción de horas, la Sra. Guevara le informó a la Sra. Alicea Pérez que una vez se estabilizara el Hospital por la situación del huracán, dejaría de tener esa reducción en su horario.

62. Inconforme con su reducción de horario, la Sra. Alicea Pérez visitó la oficina de Recursos Humanos para quejarse de la situación.

63. El planteamiento de la Sra. Alicea Pérez fue "que le habían obligado a ponchar, y ella no ponchaba" y "el horario que les iban a reducir".

64. La Sra. Alicea Pérez reconoce que, al igual que con el requisito del registro de asistencia, el asunto de la reducción de horario, no se le aplicó a ella exclusivamente, sino que fue una medida tomada en el hospital contra otro[s] supervisores y líderes de la institución.

65. La Sra. Alicea Pérez también reconoce que con una situación de emergencia y en las condiciones que estaba en el Hospital en este momento tras el paso del huracán María, se justificaba reducir o hacer cambios en el horario del personal.

66. Durante su visita a Recursos Humanos, la Sra. Alicea Pérez nunca mencionó sobre comentarios alegadamente realizados por la Sra. Guevara.

67. Sus únicas quejas fueron: (a) el requerimiento de ponchar, en igual condición que otros supervisores; y (b) el cambio del horario que se estaba reduciendo y que entendía que no era justo.

68. Ante la inconformidad presentada por la demandante, el Sr. José García le contestó que operacionalmente, no era factible dejar al cien por ciento de los empleados porque no había taller, no había manera. Y el área clínica era una de las más afectadas, porque no había pacientes.

69. El Sr. José García también le indicó que "no solamente ella se iba a ver afectada, pero que más personas iban a estar afectados. Pero que inmediatamente que se restableciera el servicio, todos los que estaban, este, que se lo hubiesen afectado, pues se iban... a llamar para que regresaran a trabajar".

70. Después de discutir el asunto con el Sr. García, la Sra. Eneida Alicea Pérez presentó su carta de renuncia al hospital el 20 de octubre de 2017.

71. La Sra. Alicea Pérez renunció tan pronto le informaron que reducirían sus horas.

72. La Sra. Alicea Pérez nunca se vio afectada por esta medida de reducción de horario, pues en el Hospital se habían hecho arreglos para que cobrara sus ochenta (80) horas hasta el día de ser efectiva su renuncia.

73. Después de que la Sra. Alicea Pérez tomó la decisión de renunciar al Hospital, fue al Departamento del Trabajo a solicitar beneficios de desempleo.

74. El Departamento del Trabajo le denegó los beneficios, por haber abandonado voluntariamente y sin justa causa un trabajo adecuado. La demandante no apeló la decisión.

El foro *a quo,* en lo pertinente, concluyó "[n]o podemos llegar a la conclusión aspirada por la [apelante] de que fue víctima de un despido tácito o forzada a renunciar. Todo lo contrario, nos resulta forzoso concluir que la reducción de horarios establecida a la [apelante] en octubre de 2017 fue una medida originada por un motivo vinculado al legítimo interés del Hospital de salvaguardar el bienestar de la empresa. La mera alegación de la Sra. Alicea Pérez no es suficiente, pues no se cumplen los elementos establecidos en el Artículo 5 de la Ley 80-1976 para configurar esta causa de acción".

En desacuerdo, el 29 de septiembre de 2022, la señora **ALICEA PÉREZ** acudió ante este tribunal intermedio revisor mediante *Apelación,* y le imputó la comisión del(de los) siguiente(s) error(es):

Erró el Tribunal de Primera Instancia al determinar, contrario a la evidencia y a los testimonios presentados en el juicio en su fondo, que la apelante no sufrió un despido constructivo e injustificado.

El 3 de octubre de 2022, dictaminamos *Resolución* en la cual, entre otras cosas, concedimos un plazo perentorio de treinta (30) días para presentar alegato en oposición; y se dispuso el procedimiento de la reproducción de la prueba oral. El 25 de octubre de 2022, **HBS** presentó su *Alegato de la Parte Apelada.* Más tarde, el 2 de noviembre de 2022, **HBS**

presentó *Moción en Cumplimiento de Orden* acompañada de la *Transcripción de Regrabación de Vista en su Fondo*. El 4 de noviembre de 2022, pronunciamos *Resolución* acogiendo la transcripción de la prueba oral y concediendo plazo a las partes para presentar alegatos suplementarios. Por consiguiente, el 16 de noviembre de 2022, la señora **ALICEA PÉREZ** presentó *Alegato Suplementario de la Apelante*. El 29 de noviembre de 2022, **HBS** presentó *Réplica a "Alegato Suplementario de la Parte Apelante"*.

Evaluado concienzudamente el expediente del caso, contando con la comparecencia de ambas partes y habiendo estudiado minuciosamente la transcripción de la prueba oral estipulada, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

- II -

- A -

La Ley Núm. 80 de 30 de mayo de 1976, conocida como *Ley de Indemnización por Despido Sin Justa Causa* "tiene el propósito de proteger al empleado de actuaciones arbitrarias del patrono e imponer remedios económicos que desalienten la práctica de despedir a los empleados injustificadamente".[17] Esta política pública, dirigida a desalentar los despidos injustificados, se sustenta en que […] el trabajo tiene una función social trascendental tanto en el ámbito individual como en el colectivo. A esta realidad responde nuestra afirmación de que el trabajo tiene un hondo significado ético, porque mediante éste la persona aporta al bien común y se autor[r]ealiza.[18]

Las protecciones conferidas por la Ley Núm. 80-1976, *supra,* se extienden a todo empleado que: (1) trabaja para un patrono mediante remuneración; (2) haya sido contratado sin tiempo determinado, y (3) sea

---

[17] Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA § 185a y siguientes. *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 929 (2015).
[18] *Orsini García v. Srio. de Hacienda,* 177 DPR 596, 622 (2009) (comillas omitidas).

despedido sin que mediara una justa causa.[19] Presentes estas circunstancias, el empleado así despedido tiene derecho a recibir de su patrono el pago de una indemnización, típicamente denominada como la *mesada,* cuya cuantía dependerá de la duración del empleo y del sueldo que devengaba.[20] Es por esta razón que es importante destacar que "*el estándar de justa causa es el requisito requerido en la mayoría de los países del mundo para convalidar las acciones de los empleadores. Si el patrono despide injustificadamente a un trabajador estaría entonces sujeto a la sanción económica que impone el estatuto protector*".[21]

Ahora bien, nuestro ordenamiento jurídico no prohíbe absolutamente el despido de un empleado o empleada; más bien, castiga el despido sin justa causa.[22] La Ley Núm. 80-1976, *supra,* considera injustificado el despido que se hace por mero capricho del patrono, y no guarda relación con la necesidad de asegurar el buen y normal funcionamiento de un establecimiento.[23]

La Ley Núm. 80, en su Artículo 2, instituye posibles situaciones en las cuales existe justa causa para el despido:

(a) Que el obrero siga un patrón de conducta impropia o desordenada.
(b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.
(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
(d) Cierre total, temporero o parcial de las operaciones del establecimiento.
(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.[24]

---

[19] 29 LPRA § 185a.
[20] *Id.; Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 230 (2015); *Whittenburg v. Col. Ntra. Sra. Del Carmen,* 182 DPR 937, 950 (2011).
[21] C. Zeno Santiago, *El Despido y la Política Social en Nuestro Estado de Derecho*, 34 Rev. Jur. Uipr 213, 217 (2000).
[22] *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 904 (2011).
[23] 29 LPRA § 185b; *León Torres v. Rivera Lebrón,* 204 DPR 20, 38 (2020).
[24] 29 LPRA 185b.

En el Artículo 5 de la aludida Ley se define el *despido constructivo* de la siguiente manera:

A los efectos de las secs. 185a a 185m de este título se entenderá por despido, además de la cesantía del empleado, su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados de industria y negocios estacionales o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra.[25]

Al comentar sobre la definición contenida en el antes mencionado artículo, Jorge Farinacci Fernós expone:

**[N]o hay tal cosa como una causa de acción por despido constructivo en Puerto Rico**. Lo que sí existe es una causa de acción por despido injustificado bajo la Ley 80, en la que se utiliza una definición particular de despido contenida en el artículo 5. Es decir, ya sea porque hubo una cesantía, una suspensión prolongada o una renuncia forzada, en todos estos casos estamos ante un despido, punto. Una vez se establece la existencia del despido, no hay diferencia en si fue producto de una cesantía o una renuncia forzada. Si bien el origen de esta figura es una causa de acción independiente proveniente del *common law,* la forma en que fue adoptada en Puerto Rico no fue como una causa de acción independiente sino como parte de la causa de acción estatutaria general de despido injustificado.[26]

A esa renuncia se le ha denominado en la jurisprudencia como el *despido constructivo* o tácito.[27] Nuestro Máximo Foro ha reconocido esta modalidad de despido aún antes de la vigencia de la Ley Núm. 80.[28]

Específicamente, de la definición estatutaria podemos colegir tres (3) elementos importantes, a saber: (1) renuncia motivada; (2) por actuaciones del patrono, y (3) dirigidas a inducirlo o forzarlo a renunciar.[29] Cabe resaltar que, **el *despido constructivo* no se trata de cualquier tipo de renuncia, sino de una renuncia motivada por actuaciones del patrono**. (énfasis nuestro). Para determinar si el efecto de las actuaciones del patrono está dirigido a inducir una renuncia, se ha determinado que se debe demostrar

---

[25] 29 LPRA 185e.

[26] J. Farinacci Fernós, *Interpretación liberal: presunciones probatorias en la legislación protectora del trabajo*, 83 Rev. Jur. UPR 16, 40, 41 (2014). (énfasis nuestro).

[27] *Rivera Figueroa v. The Fuller Brush Co., supra,* pág. 907.

[28] *Rivera Figueroa v. The Fuller Brush Co., supra*, págs. 907- 908; *Vélez de Reilova v. R. Palmer Bros., Inc.*, 94 DPR 175, 178 (1967).

[29] Farinacci Fernós, *supra*, págs. 41- 42.

que "una persona razonable se sentiría forzada a renunciar", es decir, utilizando un criterio objetivo y no "a la visión subjetiva del empleado individual".[30]

Nuestro Tribunal Supremo advirtió que, "**dado que el *despido constructivo* es un despido disfrazado que tiene la apariencia de una renuncia voluntaria, los tribunales de instancia deben ser sumamente cautelosos al momento de determinar si, en efecto, una renuncia fue forzada**".[31] De igual manera, no es relevante si la acción fue dirigida a varios empleados, ya que la manera de probar la intención de forzar la renuncia es demostrando que una persona razonable en la posición del empleado se sienta forzada a renunciar, lo cual puede ser el producto de condiciones onerosas dirigidas contra él o contra varios empleados.[32]

En lo pertinente a la jurisdicción federal para propósitos de la 42 USCA sec. 2000e–3(a) se ha reconocido en la jurisprudencia la figura del despido constructivo en represalia (*retaliatory constructive discharge*).[33] Así las cosas, para probar un *despido constructivo* en represalia requiere que el promovente establezca que el ambiente de trabajo era hostil.[34] Por lo que, las condiciones de trabajo impuestas, en represalia, por el patrono deben ser de tal grado que una persona razonable se sentirá forzada a renunciar.[35]

- III -

La señora ALICEA PÉREZ punteó que el foro primario incidió al determinar, contrario a la evidencia y a los testimonios presentados en el juicio en su fondo, que no sufrió un despido constructivo e injustificado. Argumentó, además, que dado a la atmósfera hostil creada y permitida por el

---

[30] *Rivera Figueroa v. The Fuller Brush Co.*, *supra*, pág. 908; *S.L.G. Hernández-Beltrán v. TOLIC*, 151 DPR 754, 777 (2000); *Vélez de Reilova v. R. Palmer Bros, Inc.*, *supra*, pág. 178.
[31] *Rivera Figueroa v. The Fuller Brush Co.*, *supra*, pág. 918 (énfasis nuestro).
[32] *Íd.*, págs. 918-919; Farinacci Fernós, *supra*, pág. 44.
[33] *Hernandez-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997).
[34] *Hernandez-Torres v. Intercontinental Trading, Inc.*, supra.
[35] *Alvarado v. Donahoe*, 687 F.3d 453, 465 (1st Cir. 2012).

**HBS,** la única alternativa que le quedaba era notificarle su renuncia lo que equivalió a una renuncia constructiva.

Por otro lado, el **HBS** adujo que la señora ALICEA PÉREZ atestiguó que las razones que la indujeron a renunciar en octubre de 2017 fue el requerimiento de registrar su asistencia mediante el ponchador y la reducción en los horarios producto del paso del huracán María.

Al evaluar el error que la señora ALICEA PÉREZ arguyó que cometió el foro primario, basta con justipreciar y analizar el expediente para comprobar que, conforme a la toda la evidencia aquilatada, ésta no se vio forzada a renunciar a su empleo. Veamos.

En su carta sobre renuncia cursada el 20 de octubre de 2017, la señora ALICEA PÉREZ expuso, en lo pertinente, que:

> Durante los pasados meses he sido víctima de un constante patrón de maltrato y discrimen contra mi persona en mi lugar de empleo realizado y permitido por la administración del Hospital Buen Samaritano de Aguadilla, PR. Entre esto se encuentra la forma despectiva y humillante de despojarme y privarme de las posiciones para las cuales poseo tanto la preparación académica como la experiencia...Constantemente la Sra. Myrna Guevara hacía comentarios despectivos, irrespetuosos y humillantes contra mi persona...".[36]

Más, se desprende de la transcripción de prueba oral que la señora ALICEA PÉREZ narró y describió unos sucesos que aparentemente tuvo con la nombrada directora de Enfermería, señora Myrna Guevara (señora Guevara). La señora ALICEA PÉREZ señaló que cuando era directora interina, es decir, supervisora de la señora Guevara, le llamó la atención por unos informes y por ello, la señora Guevara tenía motivos para molestarla en el lugar de empleo. Asimismo, expuso que la señora Guevara se burlaba de ella constantemente con comentarios despectivos, irrespetuoso y humillantes. Incluso, le decía que la iban a sacar de su trabajo, además, de sacarle en cara que tenía mejor salario y beneficios que ella.[37] También, la señora ALICEA

---

[36] Véase Apéndice de la *Apelación*, pág. 231.
[37] Véase Transcripción de Prueba Oral, tomo I, págs. 39– 45.

**PÉREZ** manifestó que sus condiciones de empleo cambiaron pues (1) tenía que registrar su asistencia diaria; y (2) le redujeron las horas de trabajo producto del paso del huracán María.[38]

Por su parte, el **HBS** aseguró que la decisión de no nombrar a la señora **ALICEA PÉREZ** como directora de Enfermería se debió al proceso de sindicalización del grupo de enfermería bajo su supervisión y del cual no tuvo conocimiento alguno. En su declaración, el señor García expresó que:

> La persona [que ocupe la posición] tiene que tener el liderazgo, ser una persona comunicadora, estar disponible para… que le comuniquen, fomentar confianza entre… sus empleados. Ser asertivo, ser… estar, verdad, pendiente de todo lo que pasa con su grupo de trabajo. Estar al tanto de todas las regulaciones y las leyes; de todos los cambios y los impactos. Tener… conocer el… verdad, todo lo que tiene que ver con el cuidado de salud, porque va a estar, supervisando personas que están atendiendo paciente[s]. Y obviamente, que tenga un buen estilo gerencial, donde pueda relacionarse adecuadamente con sus subalternos. Pueda atender sus necesidades y resolverle.[39]

En consonancia, según las determinaciones de hecho y la evidencia que obra en el expediente: (1) el personal de enfermería entendía que no había espacio para una comunicación directa con la señora **ALICEA PÉREZ**; establecieron otros mecanismos para tratar de resolver sus inquietudes y necesidades; y no estaban contentos con su administración de enfermería; (2) la señora **ALICEA PÉREZ** reconoció que tanto el asunto de la asistencia como la reducción de horario, no se le aplicó a ella exclusivamente, sino que fue una medida o decisión tomada por el **HBS** adoptada para otros supervisores y líderes de la institución; y (3) la señora **ALICEA PÉREZ** nunca se afectó por la medida de reducción de horario debido a que el hospital había hecho arreglos para que cobrara sus ochenta (80) horas hasta el día de ser efectiva su renuncia.

---

[38] Es menester señalar que el registro de la asistencia constituía un requisito para todos los empleados que trabajan en el área clínica y la reducción de horas en el empleo no fue aplicada solamente a la señora **ALICEA PÉREZ**, sino que fue una medida temporera causada por las condiciones en las cuales se encontraba el hospital después del huracán María. Ambos hechos fueron admitidos por la señora **ALICEA PÉREZ**. Véase Apéndice de la *Apelación,* págs. 45, 104, y 106– 112.

[39] Véase, Transcripción de Prueba Oral, Tomo III, págs. 14– 15.

Colegimos que la señora **ALICEA PÉREZ** no esbozó cuales fueron las actuaciones de su patrono **HBS** o condiciones de empleo onerosas dirigidas a inducirla a renunciar a su empleo. Solamente hizo expresiones de lo alegadamente acontecido con la señora Guevara. El tribunal primario estuvo en mejor posición de sopesar y aquilatar toda la prueba presentada ante su consideración. Más aún, este tribunal revisor no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad del foro de instancia, en ausencia de haber incurrido en error manifiesto, pasión, perjuicio o parcialidad.

## - IV -

Por los fundamentos antes expuestos, ***confirmamos*** la *Sentencia* intimada el 22 de agosto de 2022 por el Tribunal de Primera Instancia, Sala Superior de San Sebastián.

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

La Jueza Cintrón Cintrón concurre con el resultado sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones